Travis W. Koch #7-5418
Koch Law, P.C.
121 W. Carlson St, Suite 3
Cheyenne, Wyoming 82009
307-426-5010
tkoch@kochlawpc.com
*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING
## CHEYENNE DIVISION

| | | |
|---|---|---|
| AXTRA, LLC, and THE AXIA-AXTRA TRUST, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:22-cv-00144 |
| AXIA ISSUER, INC., and THE AXIA FOUNDATION, | ) ) ) | |
| Defendants. | ) ) | |

---

## FIRST AMENDED COMPLAINT

---

Plaintiffs Axtra, LLC and The AXIA-Axtra Trust file this Complaint against AXIA Issuer, Inc.; The AXIA Foundation Inc.; and Berkower LLC, and would respectfully show the Court as follows:

### I.
### <u>THE PARTIES</u>

1.      Axtra, LLC ("Axtra") is a Wyoming Limited Liability Company.

2.      The AXIA-Axtra Trust (the "Axtra Trust") is a unit trust formed under the laws of the Cayman Islands.

3.      AXIA Issuer, Inc. ("AXIA Issuer") is purportedly incorporated under the laws of the British Virgin Islands.   AXIA Issuer has appeared and is presently before the Court.

4.      The AXIA Foundation Inc. (the "Foundation") is purportedly a not-for-profit entity formed under the laws of the Commonwealth of Dominica.  The Foundation has appeared and is presently before the Court.

5.      Berkower LLC ("Berkower") is a New Jersey Limited Liability Company, licensed in various states of the United States, including in this Circuit (Kansas) and having offices at least in New Jersey, Miami, Los Angeles, and the Cayman Islands.  Berkower can be served with process by serving its registered agent for service of process, Maurice Berkower located at 517 Route 1, Suite 4103, Iselin, New Jersey 08830.

6.      Axtra and the Axtra Trust are referenced herein individually, and collectively referenced herein as the Plaintiffs.  AXIA Issuer and The Foundation are referenced herein individually, and collectively referenced as "AXIA."

7.      AXIA and Berkower are collectively referenced as "Defendants."

### III.
### NON-PARTY CONSPIRATORS

8.      Nick Agar ("Agar") is the co-founder, President and Chief Executive Officer of AXIA Issuer, Inc., and a person who also shares control of, and exercises control over, AXIA Issuer, the Foundation, AXIA Capital Bank, and other AXIA-related entities, including but not limited to, AXIA Systems, Inc., AXIA Operations Ltd., and the AXIA Network Foundation.  On information and belief, Agar resides in Canada.

9.      AXIA Capital Bank, an affiliate of AXIA and other AXIA-related entities, is a banking institution purportedly formed in the country of Dominica and conducts business in the United States and elsewhere, including entering into contracts with Visa U.S.A., and, on

information and belief, with FIDO and Mellon banks in New York, and The Bancorp Bank of Wilmington, Delaware.

10.     AXIA Operations Ltd. is a corporation having a principal place of business in Toronto, Canada.

11.     Trevor Federkiewicz, an individual residing in Canada, is an officer and director of 12 Peers Capital Markets, Ltd. (one of AXIA's "Global Partners")[1] (Trevor Federkiewicz and his company, 12 Peers Capital Markets, Ltd. are collectively referenced as "Federkiewicz").  12 Peers Capital Markets, Ltd.purportedly has a principal place of business in the Cayman Islands.

12.     Agar, AXIA Capital Bank, AXIA Operations Ltd., and Federkiewicz are sometimes collectively referenced herein as "Non-Party Conspirators."

### III.
### JURISDICTION AND VENUE

13.     The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

14.     The Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331 and § 1367.

15.     This Court has personal jurisdiction over each Defendant.  Defendants continuously and systematically engage and/or engaged in business with a specific Wyoming limited liability company, Axtra, and AXIA (along with the Non-Party Conspirators and others) market and/or marketed their cryptocurrency project to all Wyoming residents and affect the finances of all Wyoming residents that invested in their cryptocurrency project.  Berkower is licensed and offers its services to the general public in this Circuit.  In accordance with 18 U.S.C. § 1965(a) and (b),

---

[1] https://axia.global/globalcontributors

all of the Defendants are subject to this Court's jurisdiction in that they "transact affairs" in this District.

16.     This Court also has personal jurisdiction over each Defendant because they have, at least, minimum contacts with the State of Wyoming and the United States.

17.     Knowing that Axtra was a company formed in Wyoming with a principal place of business in Sheridan, Wyoming, Defendants and their partners, affiliates and agents, (including at least Non-Party Conspirators, Agar and Federkiewicz) specifically pursued Axtra to become one of AXIA's original founders of their cryptocurrency project, negotiated with Axtra to enter contracts with this Wyoming LLC to financially back Defendants' new cryptocurrency project, placed this Wyoming LLC's cryptocurrency in Defendants' bank, AXIA Capital Bank, and placed this Wyoming LLC's options to cryptocurrency under the control of the Foundation.

18.     Defendants and the Non-Party Conspirators negotiated with Axtra for multiple months, contractually requiring that Axtra, whose principal place of business is in Sheridan, Wyoming, create the Axtra Trust, to hold Axtra's assets for the benefit of Defendants.  Defendants provided their own legal counsel, Appleby (Cayman) Ltd., to represent the interests of the Axtra Trust.

19.     During these months-long negotiations, while knowing that Axtra was formed and located in Sheridan, Wyoming, Defendants, for their own benefit, required both Axtra and the Axtra Trust to comply with all applicable Wyoming, as well as United States federal, laws concerning "anti-money laundering, know-your-customer, counterparty identification and similar laws, rules and regulations."

20.     Defendants conducted audits of this Wyoming LLC's assets using two different auditors, including Defendant Berkower, on at least two separate occasions, spanning over a year and a half.  Notably, Berkower is also one of AXIA's global partners.[2]

21.     Defendants (and the Non-Party Conspirators) have promoted for years investment in their cryptocurrency project and their bank, AXIA Capital Bank, to residents of Wyoming, including Axtra, through their websites and social media.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff Axtra is a Wyoming Limited Liability Company residing in this judicial district and a substantial part of the events giving rise to the claims in this case occurred in this judicial district, including entering into the contracts giving rise to these claims with a Wyoming company, and damaging a Wyoming company through breaches of contracts and tortious of interference with the performance of such contracts.

23.     Venue is also proper in this Court pursuant to 18 U.S.C. § 1965.

### III.
### FACTUAL BACKGROUND

24.     This Action arises out of a scheme to defraud Plaintiffs and other potential investors by a collection of sophisticated international entities and individuals through the operation of a cryptocurrency project.  The Defendants and the Non-Party Conspirators, among others, are the individuals and entities that devised, operated, and executed the scheme including entities residing or doing business in the United States, Canada, Dominica, the Cayman Islands, the British Virgin Islands, Mauritius Islands, and other parts of the world.  These entities directed their scheme to all residents of Wyoming and throughout the United States, and they executed their scheme with the

---

[2] https://axia.global/globalcontributors

assistance of U.S. banking and financial entities, U.S. auditors, and U.S.-based internet service providers that were critical to its execution.

26. At some time well prior to June of 2020, AXIA and its affiliated entities, some of which are identified above, developed a digital currency which is known as AXIA Coin and is at times referenced by its trade symbol, "AXC" (hereafter, "AXC"). AXIA promoted AXC as an "asset-backed" cryptocurrency that would serve as "The New Reserve Currency For The World." The assets that have backed AXC, including those held in trust by Axtra and pledged to AXIA, were purportedly held by The Foundation and/or other affiliates of AXIA.

26. Despite their representations to Plaintiffs and to the public, AXIA did not intend to maintain asset backing for AXC for long. Its ultimate goal, which it attempted to accomplish within a year after the public launch of AXC, was to offer the investing public a digital currency that was ***not*** backed by hard assets, but was instead backed only by the strength of the speculation of cryptocurrency investors and the general public's faith in AXIA, similar to certain "fiat" type digital currencies that have been available to investors for the past decade.

27. In order to maintain its initial image that AXC was a stable and secure asset-backed cryptocurrency, AXIA would first need to attract funders willing to pledge assets in significant quantities to grab the attention of the investing public. As the public would invest in the asset-backed AXC, the trading price of AXC would rise with demand, and the volume of trading would, hopefully, increase. Once the market price and volume of AXC trading reached sufficient levels, AXIA and certain of its principals, including Agar and AXIA co-founder, Paul Ungerman, and Federkiewicz in particular, for AXIA and for themselves personally, could capitalize on trading and make enormous amounts of profits. On information and belief, at least Agar and/or Federkiewicz also planned to profit, and did profit, by secretly siphoning off funds paid by

purchasers of AXC from AXIA Capital Bank for themselves, or by secretly issuing AXC at prices well below the existing market price, charging the purchaser full market price, and pocketing the difference instead of depositing the full payments into AXIA Capital Bank.

28.     This strategy, of course, required the promise of significant consideration to the funders that agreed to utilize their hard assets for this project, which was necessary to launch AXC and its related services to the public.  The initial funders that pledged their assets to support the AXIA strategy are hereafter referenced as "Founding Funders" or "Founders."  The Founders were in fact promised fair compensation for their contributions, and if they had been paid what they had been promised, it would have cost AXIA a significant percentage of its anticipated initial profits of money and/or AXC holdings.  AXIA explained to its Founders that their participation did not involve securities transactions because the AXC and the AXC options that the Founders would be reimbursed were asset-backed, and not speculative.  The asset backing would stabilize the price of AXC, and the Founders would be receiving true currency, that could be exchanged like any other form of international currency, instead of a typical speculative and volatile cryptocurrency.  The Founders would have the opportunity to profit from their own skillful exercise of the purchase and trading of AXC options, rather than relying on the actions and decisions of AXIA in its efforts to increase the market value of AXC.  The opportunity for the Founders to skillfully exercise and trade AXC options was the only significant feature that tended to distinguish AXIA from a securities transaction.

29.     But AXIA never intended to compensate the Founders with the AXC and the AXC options it promised to the Founders in exchange for the pledge of their assets, or maintain AXC as an asset-backed currency.  Making the promised compensation to the Founders would have significantly reduced at least the initial profits that AXIA anticipated from the public launch of its

AXC.  Instead, AXIA formed an association of entities, each having its own role in a scheme to convince the Founders to pledge their assets and to defraud the Founders out of the compensation promised for the use of their assets.  Axtra believes that AXIA's scheme was developed well before it approached Axtra for investment, and certainly before Axtra signed agreements with AXIA. Axtra knows this because of the startling admissions made by AXIA, through its counsel, in response to Axtra's demand for the compensation it was promised and the filing of this lawsuit. AXIA, through its counsel, finally revealed that Axtra never intended to fairly compensate Axtra.

30.     Axtra was the assignee of a collection of over 25 assets (comprising famous artworks, precious metals and gemstones) from over a dozen beneficial owners of those assets located around the world, whose assets have been valued by AXIA at approximately $5.6 billion US dollars, which value has been verified and confirmed by independent auditors engaged by AXIA, including Berkower.  Axtra was the largest of numerous Founders that, according to AXIA, contributed in excess of $30B in hard assets (inclusive of Axtra's contribution) for the benefit of the AXC project.

31.     AXIA communicated most of their public announcements in the U.S. and throughout the world regarding the AXC project through their website, purportedly operated by AXIA Operations Ltd.  When one of AXIA's latest websites was launched in July 2021, AXIA announced that it had the above-mentioned Founders' assets valued in excess of $30 billion USD in the AXIA "Reserves" backing the AXC.

32.     Prior to AXIA's public marketing and launch of AXC and the AXIA Network, and influenced in large part by the many representations and promises made to Axtra by Agar, Federkiewicz and others, Axtra entered into three written contracts with AXIA Issuer and The Foundation on June 5, 2020 (the "Agreements"), titled:

- *Initial Coin Offering – Trust and Subscription Agreement*,

- *Amendment to the Initial Coin Offering – Trust and Subscription Agreement and to the Declaration of Trust*, and

- *Supplemental Trust and Subscription Agreement*.

These three written agreements are collectively referenced herein as the "Agreements."

33.     Axtra also formed the AXIA-Axtra Trust (also referenced herein as the "Axtra Trust") in accordance with the terms of the ICO Agreement, which required its formation. Axtra believes that the Axtra Trust is unique among the Founders because it was formed and belongs to Axtra, and an Axtra LLC member is its trustee, instead of Agar acting as the trustee as, upon information and belief, is the case with all other Founders. The Axtra Trust is, to Axtra's knowledge, the only AXIA-related trust not controlled by AXIA or Agar. Because it is owned and controlled by Axtra LLC, any assignment of assets in trust to Axtra LLC was functionally an assignment to the Axtra Trust and was internally treated as such among Axtra and the Axtra Trust. Axtra believes that other Founders placed their assets in trusts for which Agar was the trustee. Appleby (Cayman) Ltd., was counsel to the Axtra Trust and, Axtra believes, to all the other trusts formed to hold the other Founders' assets.

34.     Under these Agreements, Axtra pledged and encumbered assets including artwork, gemstones and other items of value, to AXIA Issuer and The Foundation, to serve as a significant portion of the assets backing AXC. In return, Axtra received a certain number of AXC and a certain number of options to buy AXC.

35.     The Agreements initially required Axtra (and, on information and belief, all other owners of options) to manually provide a 20 business-days written notice of intention to exercise options to purchase AXC, unless the exercise was through a "cashless exercise" program.

However, to eliminate the manual administrative tasks associated with written notice, AXIA eventually decided instead to create the AXIA Options Platform so that options could be exercised through an internet link created by AXIA (https://options.axiacoin.com/login), and the notice requirement was eliminated. AXIA announced this change in one of its "Insider Updates" to Axtra and others in March of 2021. At about the same time, AXIA's CEO Agar explained to Axtra and Axtra's U.S. attorneys by electronic communication that options were initially intended to be exercised through mail or e-mail notice for manual processing, but to expedite matters, AXIA decided to create a web-based options trading platform so that options could be easily and freely exercised at any time without the administrative procedures and overhead associated with traditional methods. This was confirmed by Federkiewicz, who helped AXIA prepare the AXIA Options Platform.  Agar specifically stated that this new method, the AXIA Options Platform, eliminated the need for a notice period, and that the notice requirement for Axtra no longer existed.

36.     Prior to the launch of the AXC, Defendants also created the AXIA Capital Bank (an affiliate of AXIA Issuer), purportedly in the country of Dominica.  After Axtra signed the Agreements, without advance notice or any consultation with, or advance application from, Axtra, AXIA created an account for Axtra at AXIA Capital Bank and deposited Axtra's AXC into that account.  AXIA Capital Bank continued to hold Axtra's AXC; however, Axtra has never been able to access the AXC.  Also, without any consultation with, or application from, Axtra, AXIA placed Axtra's options into Axtra's account on the AXIA Options Platform, that serves, in part with AXIA Capital Bank, as the digital method of buying and selling AXC options. Like the AXC account, Axtra was effectively locked out of the options platform and unable to purchase AXC options and subsequently trade the AXC.

37.     When Axtra executed the Agreements with AXIA in June of 2020, Agar and
Federkiewicz represented to Axtra that the launch of the AXC and its network was imminent.  This
was because AXIA understood that Axtra's decision to participate in the project depended, in part,
on an imminent launch.  However, AXIA knew it was in no position to launch any time soon.
AXIA did not launch the AXC and the AXC Network until approximately 13 months later, on July
7, 2021, requiring Plaintiffs' assets to remain encumbered that entire time.

38.     Shortly prior to its public launch of AXC, AXIA promoted its AXIA Capital Bank
as a banking institution where depositors could purchase AXC at a favorable rate, and freely
exchange AXC between U.S. dollars and other cryptocurrencies, including AXC.  To encourage
additional investment into AXIA Capital Bank, AXIA also advertised that holders of AXC that
were deposited in AXIA Capital Bank would receive interest on their AXC, which would be paid
with additional AXC.

39.     As part of its July 2021 launch, AXC was first offered for public trading on a
cryptocurrency exchange called Bitmart as part of what AXIA later described as a "promotional"
launch.[3]  Shortly after the launch of AXC on Bitmart, the price of AXC jumped to over $72.00
USD per AXC on limited volume, and trading was temporarily halted.  On information and belief,
AXIA quickly realized this rapid appreciation of AXC could not be tolerated because, in fact,
AXIA Capital Bank was woefully underfunded with liquid assets, and it could not support the free
exchange of AXC for U.S. dollars.  AXIA later described this initial Bitmart launch as a limited,
promotional "test" launch that created a "fake market."  Soon thereafter, limited AXC trading on
Bitmart resumed, and trading was subsequently added to another exchange, KuCoin.[4]

---

[3] AXC is no longer being traded on Bitmart.
[4] AXC is no longer being traded on KuCoin.

40.     Once trading began a second time on Bitmart and then KuCoin, AXC market price rose from $1.25 per AXC in July 2021 steadily to in excess of $13.00 per AXC.  When AXC reached $13.43, in May of 2022, AXIA decided to split AXC at a rate of 13.43 for every 1 AXC, increasing the number of AXC held by each holder by a factor of 13.43, while simultaneously devaluing the market price of AXC to $1 per coin.  This was presumably done in advance of an anticipated launch of AXC on yet another cryptocurrency exchange.

41.     AXIA used and encumbered Plaintiffs' assets, comprising a significant part of AXIA's "Reserve," for nearly two years to initially attract many millions of dollars of purchases of AXC, and later to try to force Axtra into making unacceptable contractual concessions to AXIA. After the launch of AXC in July 2021, according to Agar and without consultation with or warning to Axtra, AXIA suddenly announced it would change its then-current "Reserve" structure under which the assets backing AXC comprise Plaintiffs' assets, to what it now calls a "Treasury" structure that will not utilize Axtra's assets (or the assets of the other Founders). As part of that change, Agar verbally and unequivocally stated to Axtra and its representatives that AXIA had released all of Plaintiffs' assets from any further obligations to AXIA, but Agar would not confirm that release in writing so that Axtra could use its assets elsewhere.  It appears to be AXIA's position that because AXIA purportedly will no longer utilize Plaintiffs' assets to support AXC after encumbering those assets for two years to support and build the AXIA project, Axtra is no longer entitled to the consideration Axtra received in the form of AXC and AXC options under its Agreements with AXIA.

42.     At or near the time AXIA split AXC on a 13.43 for 1 basis, AXIA also reconfigured the technical nature of AXC from an "ERC 20 coin" to a new form for transactional purposes, but

it was promoted by AXIA as its digital asset, AXC.  This 13.43 for 1 coin split was provided to other holders of AXC, but not to Axtra.

43.     Soon after the issuance of the AXC and the AXC options to Axtra, AXIA and AXIA Capital Bank froze Axtra's account that held its AXC, and they prevented Axtra from exercising or conducting transactions with its AXC options on the open market or to third-party investors. AXIA would not provide a cognizable explanation for these actions until near the time Axtra filed this lawsuit.

44.     Axtra intended to recognize benefits contractually available to it after having encumbered its valuable assets for approximately 24 months, primarily by monetizing its options. However, AXIA and AXIA Capital Bank precluded Axtra from exercising any of its options.  Even though it was no longer required to provide a 20-day notice to manually exercise options, Axtra provided such notice to AXIA Issuer.  But AXIA, AXIA Capital Bank, and the AXIA Options Platform locked Axtra out of its ability to exercise any of its options, either through direct payment exercise of the options, or through the cashless exercise method where Axtra could "sell" its options.  From the moment Axtra received its options, Axtra has been denied any ability to exercise any of its options.  On information and belief, the AXIA Options Platform and AXIA Capital Bank is controlled at times by AXIA Issuer, Agar, and The Foundation.

45.     Moreover, in its effort to extort valuable consideration from Axtra, AXIA unilaterally decided to demote Axtra's AXC to a subclass of AXC.  AXIA refused to allow Axtra's AXC to earn interest, while other AXIA Capital Bank account holders' AXC earned interest.  In addition, while all other holders of AXC received the benefit of the 13.43 for 1 split, AXIA refused to give Axtra the same benefit unless Axtra would agree to cancel several important terms to the Agreements it signed, and accept new and unacceptable terms.  The terms of the extortion demand

included, among other things, that for Axtra to continue to hold AXC on par with all other AXC (or hold AXC of any value whatsoever), AXIA demanded that Axtra agree to "lock-down" its AXC for years, abandon terms that ensured the security of Axtra's assets, and submit to the exclusive jurisdiction of the country of Dominica to resolve any disputes, where AXIA had been using the interim Attorney General as its own private lawyer.  This placed Axtra at a competitive disadvantage, and artificially devalued Axtra's AXC, compared to other holders of AXC.

46.     AXIA Issuer has informed Axtra, in writing, that even if the AXIA Options Platform were to allow Axtra to exercise any of its options, they would be exercised in exchange for the former technical version of AXC, could not then be the subject of any transaction, and therefore would be worthless.

47.     After years of pledging and encumbering its assets to AXIA and allowing AXIA to benefit from holding those assets in its Reserve to, among other things, build and promote the entire AXIA project and attract millions of dollars of public purchases of AXC and investments in AXIA, Axtra has been foreclosed from benefitting in any way through the "consideration" it received from its contribution of assets to AXIA.

48.     Worse, after Axtra realized that this lawsuit was necessary, AXIA finally provided explanations to Axtra's U.S. counsel for AXIA's egregious actions.  Axtra had been seeking these explanations for two years, only to be provided with incoherent or evasive answers, or no answer at all, to its questions.  Among other admissions, AXIA finally admitted to Axtra that, regarding the Agreements that AXIA induced Axtra to execute, AXIA's position has been that "no Tokens [AXC] potentially available to Axtra under the Agreements—whether received in exchange for the RTU or through an exercise of Options—were issued 'free and clear' to Axtra."  After being ignored, misdirected and lied to for years, Axtra finally learned that AXIA's position is and has

been that Axtra had *never* been issued actual AXC or options that it could *ever* exercise, notwithstanding AXIA's specific representation that Axtra's AXC was placed in a digital wallet in the AXIA Capital Bank, and that Axtra's options were placed in an account on the AXIA Options Platform.  When AXIA finally provided explanations for its actions, AXIA admitted that its and Berkower's prior representations were made with knowledge of their falsity, or a reckless disregard for the truth, and admitted that its past choices to withhold this information from Axtra were intentional omissions.  AXIA's positions, each followed by a parenthetical statement by Plaintiffs of facts that are further supported and explained in detail below in this complaint, are:

- AXIA had not been provided with sufficient proof that Axtra's assets existed;

  (AXIA, Agar and Federkiewicz had zealously investigated Axtra's assets before the Agreements were signed, and AXIA employed two different accounting firms to verify the existence of the assets long ago.  Berkower represented to Axtra that its audit confirmed Axtra's assets existed.)

- AXIA had not been provided with sufficient information concerning the ownership of

  Axtra's assets;

  (AXIA had long ago employed two different accounting firms to verify the existence of the assets long ago, and Berkower confirmed to Axtra it had sufficiently determined the ownership.)

- AXIA had not been provided with sufficient information concerning the value of

  Axtra's assets;

  (AXIA, Agar and Federkiewicz had themselves personally valued Axtra's assets before the Agreements were signed, and AXIA employed two different accounting firms to verify the value of the assets long ago, and Berkower confirmed to Axtra the appropriate value.)

- AXIA had not been provided with sufficient information regarding the source of funds

  with which those assets were acquired;

  (This claim is nonsensical, but in any event AXIA never demanded that Axtra provide such information before it issued AXC and options to Axtra,

and AXIA employed two different accounting firms, including Berkower, to verify, to the extent they wished, the propriety of the source of funds long ago.)

- AXIA was not aware of a valid transfer of Axtra's assets to a proper trust;

  (AXIA employed Berkower to investigate and verify the transfer of Axtra's assets to a proper trust, the transfer to Axtra LLC was a transfer to the proper trust, AXIA and Berkower demanded that Axtra prove the assets were transferred to Axtra LLC, and Berkower stated that the assets were properly transferred.  And AXIA issued AXC and options to Axtra, which could only be done upon proper transfer.  Moreover, AXIA's own counsel, Appleby (Cayman) Ltd., created the trust documents and also acted as Axtra Trust's counsel.  Had there been any technical issue with the transfer of Axtra's assets to the trust that AXIA and its counsel required Axtra to create, AXIA and its counsel would be responsible for any such issue.)

- AXIA was not aware of the issuance of a Redeemable Trust Unit;

  (Neither AXIA or Appleby ever provided Axtra or the Axtra Trust with a format to issue a Redeemable Trust Unit ("RTU") to Axtra because AXIA knew that was pointless under the unique Agreements Axtra signed.  AXIA knew a RTU was unnecessary, given that Axtra owned and controlled both the Axtra Trust and the assets and the RTU was only issued to verify to the Axtra Trust that Axtra's assets were in its own trust.  Further, AXIA never previously asked Axtra to perform the pointless exercise of issuing a RTU to itself.  The Agreements verified that Axtra had pledged its assets to the Foundation, AXIA never previously stated that the pointless exchange of a RTU between Axtra and the Axtra Trust was necessary, nor did AXIA ever request that Axtra and the Axtra Trust cure this now-alleged inconsequential defect.  Berkower concluded and told Axtra that Axtra's assets had been properly pledged to the Foundation, and AXIA issued AXC and options to Axtra, which could only be done upon proper transfer of Axtra's assets to the Foundation to the satisfaction of AXIA.  Axtra relied upon AXIA's and Berkower's actions and representations)

- Axtra had not provided the Accredited Investor Representation Letter specified by AXIA;

  (The Agreements contained no specifications for an Accredited Investor Representation Letter, and AXIA never previously stated one was necessary, or sought a cure of this now-alleged defect.)

- Axtra had not provided information or documents that AXIA may require in accordance with its "KYC Policy;"

  (The Agreements contained no statements of an AXIA KYC Policy, AXIA never provided such policy to Axtra, never previously stated that any such information or documents were necessary, and never previously sought a cure of this now-alleged defect.)

- Axtra had not provided a proper financing statement that, in the Trust's opinion, may be necessary;

  (AXIA never asked for a financing statement, and the only trust applicable was the Axtra Trust, which certainly did not believe it was necessary.)

- Axtra attempted to exercise its options after the AXIA "Project's failure;"

  (Axtra attempted to exercise options at least twice.  Once beginning August 30, 2021, and then again beginning February 22, 2022.  AXIA's subjective and unilateral determination of a "Project failure" near the time of Axtra's second attempt to exercise options is not a legally valid excuse to prevent Axtra from attempting to exercise its options.)

49. As a result of its relationship to Axtra, AXIA had a duty to fully disclose important information to Axtra relevant to AXIA's representations to Axtra, especially concerning Axtra's contractual rights and obligations.  In any event, if AXIA perceived any failure by Axtra to perform, it was required by contract to provide Axtra with written notice and an opportunity to cure.

50. AXIA did neither.  Instead, it misinformed Axtra, or failed to inform Axtra, of its position and original intentions while it used Axtra's assets to build its network and promote its cryptocurrency, and when this lawsuit finally became necessary, AXIA revealed its true positions and intentions.

51. Prior to signing the Agreements, including the Initial Coin Offering – Trust and Subscription Agreement ("ICO"), and before committing to the AXIA Project, AXIA, Agar and

Federkiewicz made many representations to Axtra, including its U.S. counsel, on which Axtra relied on to enter into the Agreements with AXIA.  A great number of these representations were false, and Axtra's reliance on them caused harm to Axtra.

52.     For instance, at some time prior to the end of the second quarter of 2020, AXIA prepared a marketing-type document titled "AXIA ICO Participation."   On April 13, 2020, Federkiewicz, on behalf of AXIA, sent this marketing document to Axtra's U.S. counsel to entice Axtra to invest in AXIA.  Among other things, that document represented that AXIA was a "digital currency with underlying value."  It further represented that "AXIA will have a finite supply of coin that will be set at the Initial Coin Offering ('ICO')."  In that document, AXIA claimed that the intrinsic value of AXC could be confirmed with its "asset base."  AXIA also promised that the "project is fully funded," had "asset backing that already exceeds $5B USD for a targeted launch prior to the end of Q2/20."  These representations were false.

53.     The next day, April 14, 2020, the same AXIA representative, Federkiewicz, on behalf of AXIA, sent Axtra's U.S. representative another brochure, marketing its AXC to potential investors.  That document was titled "AXIA The New Reserve Currency for the World."  This AXIA document marketed AXC as a "global currency with underlying intrinsic value that can be used as the preferred medium of exchange around the world," and an "asset related currency" with "complete transparency."  This document promised investors that AXC would be a "medium of exchange" with a "fixed supply" that was "related to assets" so that it had an "intrinsic value" and would be a "hedge against central bank manipulation."  AXIA explained that, as opposed to a fiat currency, the "Purpose of AXIA Reserve is to preserve value and provide stability which comes from the intrinsic value of the underlying asset-base."

54.     This same marketing document, sent to Axtra and its U.S. attorney on April 14, 2020, promised that investors would be able to secure AXIA payment cards that "can be used wherever Visa, UnionPay, MasterCard, etc. are accepted."   Through this document AXIA also explained that "hard assets and cash were exchanged for AXIA Coins" by the project funders, and "as a result AXIA Coin becomes most secure form of currency that has ever come into existence."  This very same pre-ICO brochure confirmed that the pre-ICO participants provided substantial asset backing for "the AXIA Coin," that the "AXIA Coin" was offered at a discount off market, that the "AXIA Coin" was available below liquidation value, and that the ICO participants "receive AXIA Coin plus Options."   AXIA promised this was "an offering that provides a near risk free opportunity to participants."

55.     This same marketing document promised specific characteristics for options on AXC.  For instance, AXIA promised that at "written request the ICO Participant shall be entitled to partake in a Cashless Option Exercise Program" whereby the participant would indicate a minimum price they would be "willing to sell their coins on the open market" with "NO requirement to use cash to exercise the Options."

56.     These representations by AXIA, made to Axtra by transmittal of April 13 and 14, 2020, as detailed in the above four paragraphs, contained significant misrepresentations.  AXIA knew these were false at the time they were made, or AXIA made the representations with reckless disregard for their truth or falsity.

57.     For example, the representation that AXIA had asset backing to fund a launch by the end of "Q2/20" was false.  AXIA may have had significant assets pledged at the time, but certainly did not have liquid assets anywhere near sufficient to support a market launch by the end of Q2/20.  In fact, AXIA did not launch until approximately 13 months later, leaving investors at

risk of being unable to fulfil commitments made concerning their assets, and made based upon the promise of an imminent launch.  But even when AXIA did launch its AXC in July of 2021, it did so with virtually no marketing, and intentionally, extremely limited volume.  AXIA eventually characterized this as a promotional "test" launch that created a "fake market."  On information and belief, this fake market was created by AXIA's deployment of multiple confederates practicing market manipulation with the publicly traded AXC.  This was designed to artificially drive up the price of AXC so that AXIA could then ensnare additional investors directly into its AXIA Capital Bank platform.  Only AXIA was in a position to know whether it had liquidity in Q2/20 sufficient to support a genuine launch of its coin, and it is implausible that AXIA was unaware of its own bank's liquidity when it promised it had sufficient asset backing to support the launch.

58.     For further example, to attract Axtra, AXIA consistently promised that, in exchange for the pledge of Axtra's assets, Axtra would receive AXC.  AXIA eventually deposited AXC into an account that AXIA created for Axtra in AXIA Capital Bank.  Then AXIA launched a marketing blitz, telling prospective investors to buy AXC from AXIA Capital Bank because it was backed by assets (of which a large part were Axtra's assets).  Once AXIA was finished with the use of Axtra's assets, it told Axtra that the AXC Axtra did receive was different from other AXC because it could not earn interest, that the AXC Axtra received was completely worthless and unmarketable compared to all other AXC, and that AXIA would not allow Axtra to exercise the options Axtra received and that those options were otherwise worthless.

59.     On June 4, 2020, after AXIA performed its own internal review of the assets Axtra would commit to the AXIA ICO, Federkiewicz confirmed by e-mail to Axtra's U.S. attorney that AXIA agreed with the designated value of Axtra's assets, and that AXIA "came up with the amounts [for designated values of Axtra's assets]."  Given AXIA's recent explanations for its

actions, this was a knowingly false statement.  Either AXIA did not perform its own internal review, or it did, and arrived at a different value.  Either way, it is not plausible that AXIA did not know the truth at the time it made this misrepresentation.

60.     Also on June 4, 2020, Federkiewicz, on behalf of AXIA e-mailed Axtra's U.S. attorney to explain exactly which documents Axtra and the Axtra Trust should sign, and when, in order complete the subscription process.  This was knowingly false because AXIA has confirmed that it did not reveal to Axtra at that time which documents, in AXIA's opinion, it needed to complete the process.

61.     As stated above, Axtra signed the Agreements with AXIA on June 5, 2020.  In those Agreements, among other things, AXIA and The Foundation represented that the Appleby (Cayman) law firm was legal counsel to each of AXIA, The Foundation, and the Axtra Trust.  Either this was a knowingly false statement when made, or Appleby has committed grave violations of its duty to its own client, the Axtra Trust, at the request of AXIA.

62.     Shortly before this lawsuit was filed, on March 18, 2022, attorney Andrew Willins of Appleby wrote to Brian Bokon as trustee of the Axtra Trust, to confront Appleby's own client (the Axtra Trust) on behalf of Appleby's other client, AXIA Issuer Inc.  Appleby claimed it had not "seen evidence that the Assets were ever transferred to the Trust."  Appleby also wrote to the Axtra Trust (its own client) that it has "not been privy to whether any of the [listed, necessary] information or documentation have been provided by Axtra," whether "the Trust was ever properly constituted," and asked "what steps you have taken as trustee to administer the Trust."  Appleby asked these confrontational questions when its other client, AXIA, unquestionably knew the answers (all in favor of compliance by the Axtra Trust).  It would be highly implausible for Appleby, if it were in fact representing the Axtra Trust since at least June 5, 2020 as represented

by AXIA, to not know the answers to these basic questions.  The only plausible conclusion is that AXIA and Appleby (which prepared all of the Agreements) knowingly misrepresented this fact and never intended that Appleby assist the Axtra Trust through representation.

63.    On June 29, 2020, after having a call with AXIA, and on AXIA's behalf, Federkiewicz wrote in an e-mail to Axtra, including one of its U.S. members and its U.S. attorney, that AXIA was having the Grant Thornton firm complete an audit specifically on Axtra's assets, and that he was unaware of "any issues or items for clarification from the Auditors so far." Regarding whether any further action or information was needed by or from Axtra, Federkiewicz reassured that "[i]f anything comes up I will advise immediately."  This was knowingly false. Neither Federkiewicz nor AXIA advised Axtra of the claimed exceptions that AXIA now claims have always been at issue.

64.    On December 21, 2020, after AXIA unilaterally populated Axtra's AXIA Capital Bank Account with Axtra's AXC, and placed Axtra's options in the AXIA Options Platform, Axtra, through one of its Managing Members, Carlo Broggi, asked Agar how this happened and, because it could only have happened if AXIA either waived the requirement of delivery of a Redeemable Trust Unit, or considered it already satisfied by the Agreements signed by Axtra, asked Agar how the process worked.  Agar responded by e-mail the same day, with copy to an Axtra U.S. member and to its U.S. counsel, avoiding Axtra's direct question about the Redeemable Trust Unit, and vaguely stating "there will be instructions provided to you for the next steps at the appropriate time."  In light of AXIA's recent admissions, this was a knowingly false statement. Instead of providing the instructions it now claims Axtra should have followed at the appropriate time, AXIA chose to omit that information from its further communications with Axtra.

65.     On January 19, 2021, Agar, AXIA's CEO, wrote to Axtra by e-mail, including to one of its U.S. members and its U.S. attorney, that "[t]here are some documents that you and the listed custodians of the assets will have to sign off on so we can list everything on the blockchain for public record and confirm the assets are real and placed in the listed location for the auditor." Agar explained that AXIA wanted to confirm the proper custodian of the assets:  "There should be no issue whatsoever as the custodian is just confirming what should already be true based on what you have signed off on and the supporting documents that were provided."  On that same day, Agar explained by e-mail that the confirmation concerning Axtra's assets was "a request coming from the auditor," and that the auditors were "looking for some kind of third party verification."  At that time, AXIA's auditor was Berkower.

66.     The next day, January 20, 2021, Agar sent to Axtra by e-mail, including to one of its U.S. members and its U.S. attorney, the draft documents that he claimed "need to be completed for the auditor."  Agar confirmed that he was told by Berkower "this is the final requirement."  In the document drafted by Berkower and provided by AXIA titled "AXIA ISSUER INC," AXIA told Axtra that "[o]ur independent accountants, Berkower LLC, are conducting an examination of our balance sheet.  Please confirm that the following asset(s) were contributed for the benefit of the AXIA Foundation in exchange for AXIA tokens as of November 30, 2020."  In that same document, Berkower and AXIA confirmed that by this point, and with the verification requested by Berkower and AXIA, they considered Axtra's AXC were "issued in exchange for the Redeemable Trust Units," and that Axtra "is hereby granted an option to acquire two (2) Tokens for each Token issued in exchange for the Redeemable Trust Unit."  But given AXIA's recent admissions, this had to be a knowingly false statement, or made with reckless disregard of the truth.  Berkower and AXIA could not have believed that, with Axtra's execution of the documents

prepared by Berkower and AXIA, Axtra's valid AXC were issued and that it was validly granted its options in exchange for the Redeemable Trust Unit.

67.     Along with the aforementioned document, and with the same e-mail, AXIA also sent to Axtra by e-mail, including to one of its U.S. members and its U.S. attorney, a complete set of documents, each titled "AXTRA LLC."  With those documents, AXIA required each Axtra contributor to confirm that *Axtra LLC* now owns the asset, as a condition to Axtra receiving AXC tokens and options per the ICO agreement.  Berkower and AXIA required each Axtra asset owner to sign a document that began: "Please confirm that AXTRA LLC owns the following asset(s) as of November 30, 2020 and conducted or maintained them with your organization."

68.     On January 22, 2021, Federkiewicz, on AXIA's behalf after speaking with Agar, sent an e-mail to Axtra's U.S. attorney explaining that AXIA would draft a letter that Axtra would need each of its asset contributors to sign to satisfy AXIA's requirements for confirming the status of ownership and location of the Axtra assets.  In that e-mail, AXIA referenced "the letter that is required to be signed by AXTRA LLC (Carlo), and the original owners of the assets."  AXIA gave specific instructions to Axtra regarding who should sign the letter, and confirmed that "I have asked for clarification on the wording and the intent of the document, I wanted to ensure there was no additional requirements of documents to be attached to this simple document."  This was clearly a misrepresentation of material fact because AXIA has now recently stated that it has always believed there were "additional requirements of documents."  AXIA simply chose not to disclose them until it was ready to inform Axtra that it never actually received real AXC or options to AXC, despite all evidence and prior representations by AXIA to the contrary.

69.     In that same e-mail, Federkiewicz further confirmed that "Nick has assured us and confirmed that no supplemental documentation will be required.  The auditors are just confirming

on what has already been supplied and agreed to."  Describing the signing of this letter as "an administrative process," Federkiewicz pleaded that the "auditors, along with AXIA, would like to proceed without any changes to the document provided." Berkower "are just confirming on what has already been signed and agreed to" and reassured Axtra that the audit had nothing to do with the quality of Axtra's assets, or would result in Axtra losing its AXC and options.

70.    A week later, on January 28, 2021, Federkiewicz, on behalf of AXIA, sent to Axtra's U.S. counsel a "draft of the changes from the auditors" to the document that AXIA required each asset contributor to sign.  This required slightly modified language to the phrase "confirm that AXTRA LLC owns the following asset(s)", replacing the word "owns" with the phrase "is the title owner of."  And instead of requiring those contributors to provide "statements and supporting documents" that had already been provided, it now required that the contributors merely "confirm" them with AXIA.  These letters drafted by Berkower and AXIA were dated January 15, 2021.

71.    To facilitate AXIA's need to publicly announce that it properly held Axtra's assets to back the AXC, on February 5, 2021 Federkiewicz, on behalf of AXIA, sent an e-mail to Axtra's U.S. counsel to explain that AXIA was "just following up to make sure everyone is completing the tasks as fast as possible, because this is on the critical path, and we cannot proceed to announce our assets even if 1 of any of our asset holders don't sign."

72.    In March of 2021, AXIA publicly announced the existence of its web-based Options Platform, whereby holders of options to AXC could exercise options in a manner that would avoid the delay associated with a manual notice requirement to AXIA, as previously envisioned by AXIA.  AXIA explained in detail that:

> **"The AXIA Options Platform will be utilized by you to exercise the options. You will have complete control of the specified allocation at all times. You can manage your options however you see fit . . ."**

and that

> **"The options can either be exercised by purchasing AXC for 1 USD or sold directly to the market in a cashless manner via a market or limit order."**

and that

> "**You can buy or sell your options regardless of the market price of AXC. You can choose whether to buy or sell part or all of your allocated options at the time each executed transaction.**"

and confirmed that:

> "**Again you are in complete control as to how to manage the options.**"

73.     Each of these statements was false.  AXIA later took the position that Axtra did not and would not have complete control or could manage its options as it saw fit, and could not purchase AXC or sell directly into the market in a cashless manner, or any other manner.

74.     On April 11, 2021, Agar sent an e-mail to Axtra, including to one of its U.S. members and its U.S. attorney, stating: "I wanted to let you know that we might have one final hurdle left with the auditor.  They promised this will be the absolute last thing they will ask for." Agar explained that AXIA's auditor (Berkower) "may call the asset owners / custodians to confirm that they signed their respective custodian confirms for the assets.  That will be it."  But AXIA has recently confirmed that that wasn't it.  After Axtra allowed Berkower to contact Axtra's asset contributors and receive the requested confirmations, AXIA omitted that it would later demand much more, and would not provide Axtra with the opportunity to cure any defect, however inconsequential, as required by the Agreements, but would unilaterally declare that it was too late to cure.

75.     On April 14, 2021, in a phone call with at least one of Axtra's members and its U.S. attorney, Agar confirmed AXIA's March, 2021 public announcement concerning the lack of notice needed to exercise any options to AXC, and that Axtra was fully empowered to exercise its own

options.  Agar stated "[w]e and I think this has been mentioned on a number of times we want you to exercise on those options.  We want you to do it as soon as possible."  Agar explained that the prior option notice requirement "was actually before like and I think this is really the evolvement of the project that was before we decided to just automate everything through the option platform." In direct response to a question regarding whether a "20-day rule" existed any longer, Agar again confirmed this 20-day notice requirement for the exercise of options did not exist.

76.    At some time between April 5 and May 12, 2021, Berkower published its "AXIA FOUNDATION SCHEDULE OF INVESTMENTS AND INDEPENDENT ACCOUNTANT'S REPORT," which Berkower dated November 30, 2020, and which Berkower and AXIA caused to be sent to Axtra's U.S. counsel.  This Berkower report explained the AXIA participant subscription process, whereby once the participant transfers its assets, AXIA tokens are issued to the participant.  Berkower's report expressly stated: "In our opinion, the Schedule of Investments of AXIA Foundation as of November 30, 2020, is fairly presented in accordance with the measurement and disclosure criteria set forth in the notes to the Schedule in all material respects." That schedule included the assets that AXIA and Berkower considered that Axtra had properly contributed to the AXIA Foundation.

77.    In explaining the procedure that Axtra had followed, Berkower wrote in its report that the "participant transfers legal and beneficial title of the designated assets, free of any beneficial interest and any security interests and together with all accrued benefits and rights attaching or accruing to such assets to AXIA in exchange for AXIA Tokens."  Given AXIA's recent admissions, and although Axtra is confident it did in fact properly complete the subscription process, Berkower could not have reached the opinions that it published in its report.  These

opinions were misrepresentations to Axtra intended to convince Axtra it should continue to encumber its assets in the AXIA project. This strategy worked, causing harm to Axtra.

78.     On April 25, 2021, Federkiewicz, on behalf of AXIA and after speaking with Agar, sent an email to Axtra, including to one of its U.S. members and several of its U.S. attorneys, explaining that AXIA might be willing to formally, and in writing, confirm that no 20-day notice requirement existed for Axtra for the options it had already been awarded. This would confirm what Agar had already verbally told Axtra. Federkiewicz wrote "[s]pecifically, I believe that one item that clearly is a game changer for Axtra is the offer from Nick to eliminate the 20 days' notice to execute options that is in your current agreement." Federkiewicz explained that "Nick offered this to Axtra because he wants Axtra to execute freely your options and have the flexibility to strike while the market is hot and provide the most benefit to Axtra and any owners you need to satisfy." To ensure Axtra's continued participation, Federkiewicz reassured that "Nick mentioned on the call about how AXIA is motivated to do everything possible to ensure that Axtra achieves the highest possible gain knowing it will only mean greater things for AXIA and everyone else who is participating." AXIA could not have believed this statement was true when Federkiewicz made it on AXIA's behalf because, among other things, AXIA has admitted that its position has always been that Axtra never received any options to exercise in the first place.

79.     On June 23, 2021, the CEO of AXIA, Agar, wrote to Axtra's U.S. lawyer by e-mail and confirmed that "AXIA accepted the (Axtra) assets", and that "Axtra received 2 options for every one AXIA Token." Yet AXIA recently admitted that AXIA had never actually accepted Axtra's assets, and that Axtra had never actually received options.

80.     On June 29, 2021, Agar wrote by e-mail to Axtra, including to one of its U.S. members and several of its U.S. attorneys, confirming that Axtra's assets were still within the

AXIA project.  Yet AXIA now states that its position has always been that Axtra's assets were never in the AXIA project.

81.      Beginning approximately August 30, 2021, Axtra attempted to buy and exercise options through a combination of its AXIA Capital Bank account and the AXIA Options Platform. Carlo Broggi, one of Axtra's Managing Members, sent a wire transfer to Axtra's AXIA Capital Bank Account so that Axtra could conduct the transaction, and AXIA Capital Bank confirmed receipt of those funds by e-mail of August 31, 2021.  When AXIA Capital Bank asked Axtra to create a personal account to accept the wire transfer, Mr. Broggi explained that he wished to send the funds to the Axtra business account, not a personal account.  However, AXIA Capital Bank would not allow Axtra to do so.  On September 1, 2021, AXIA Capital Bank told Axtra that it should allow AXIA Capital Bank  to "set up a secondary business account" and that this "account will be used as a spendable business account for AXTRA, LLC where these funds will be flowed into and available to be spent immediately."

82.      When Axtra responded to say that Axtra did not want a secondary account, AXIA's CEO, Agar, acting now as AXIA Capital Bank, immediately stepped in the same day to tell Mr. Broggi that he was "a little confused and surprised by this correspondence and the fact that this matter was brought to my attention."  Agar reassured Axtra that "I will take this time to look into this more thoroughly for you and your representatives and you will hear soon with a good path forward."  Agar then chastised Broggi with "I am only disappointed because this is taking me away from working on other matters that are of much greater value for the overall project which I don't think is in your best interest or anyone else's."  None of the Defendants told Axtra at the time that it would *never* be able to exercise any of its options, a decision that AXIA had made before Axtra entered into the Agreements.

83. However, neither Agar nor AXIA Capital Bank resolved the issue for Axtra. The only way to buy and exercise AXIA options was to transfer funds from an AXIA Capital Bank account to AXIA, but AXIA Capital Bank refused to allow Axtra to place funds in its account, thereby making the purchase and exercise of options impossible for Axtra to accomplish. Further, the statements made by AXIA Capital Bank and Agar, acting as AXIA and the bank, were knowingly false, or at a minimum, omitted vital information. Neither of them disclosed that AXIA intended that Axtra would never be able to exercise options, at least because, AXIA's position was that Axtra never received exercisable options in the first place.

84. Making another attempt to exercise its option rights, on February 22, 2022, although no notice was then required, Axtra gave written notice to AXIA of exercising its rights to participate in the cashless option exercise program, Axtra and provided a fully and properly completed written request form consistent with the ICO Agreement.

85. Also on February 22, 2022, and again without a notice requirement, Axtra gave written notice to AXIA that it would exercise additional options held by Axtra, through the payment of cash to Axtra's AXIA Options Platform account.

86. With its February 22, 2022 notices to AXIA that it intended to exercise options both through the cash and cashless methods, Axtra asked AXIA to advise Axtra if AXIA believed its intentions were in anyway inconsistent with the Agreements. None of the Defendants provided a coherent response at that time, and certainly failed to reveal the information, and their positions, which they finally provided near the time Axtra filed this lawsuit – that AXIA never issued the exercisable options that Axtra was entitled to.

87. After this lawsuit was filed, the Defendants confirmed their cooperation with, and the corruption of, AXIA Capital Bank to perform unlawful services for the Defendants. The

Defendants obtained sensitive and personal confidential documents that AXIA Capital Bank account holders, or representatives of account holders, had submitted in confidence to AXIA Capital Bank as part of that bank's required due diligence and account registration process.  The Defendants unlawfully obtained those documents and publicly filed them with this Court with their pending motion to dismiss.

88.     Shortly before this First Amended Complaint was submitted to this Court, AXIA made a public announcement that it was preparing a "wind-down plan."  The details of this plan are unknown.  For instance, AXIA did not provide any details on who would administer a wind-down, whether it would be administered by an independent third party, whether AXIA planned to transfer its assets to a truly independent third party or to an insider, what would become of any funds that may have been secretly siphoned off its bank by Agar, Federkiewicz, or others, or how it would attempt to make Axtra whole.

## VI.
## CAUSES OF ACTION

**COUNT 1:     VIOLATIONS OF 5 U.S.C. § 78j(b) [SECTION 10B] and 17 C.F.R. § 240.10b-5 [SECTION 10B-5]**

89.     Axtra restates each and every allegation contained in Paragraphs 1 through 88, above.

90.     Securities and Exchange Commission Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a)     To employ any device, scheme, or artifice to defraud,

(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security

91.     The sale and offer of sale of AXC and AXC options, as alleged herein, was in connection with and constitutes the sale of a security, and Defendants' activities operated within the United States and have affected interstate commerce.  Federal securities laws regulate Defendants' actions and this Court has jurisdiction to apply Section 10b-5 with respect to all activities alleged and described herein.

92.     The Agreements AXIA drafted to facilitate the sale of a security were designed to, and did, induce Plaintiffs to purchase a security, and were obtained by fraud.  Included within the fraudulent activity was AXIA's proclamation in the Agreements that their scheme did not involve a securities transaction.  As alleged herein, AXIA represented that its AXC was and would continue to be an asset-backed cryptocurrency, and not a speculative fiat type currency, and that Plaintiffs would be awarded exercisable options to AXC in connection with their subscription. With those options, Plaintiffs could expect profits from their own business acumen, through the process of exercising and buying or selling their options.  Instead, AXIA prevented Plaintiffs from exercising their options and changed AXIA's structure away from an asset-backed cryptocurrency to a speculative fiat currency.  With this changed structure, Plaintiffs could only profit from their investment based on the acts of the sellers of the investment, and their representatives, as they exclusively promoted and marketed their cryptocurrency.

1.  **Section 10b(5) Subsections (a) and (c) Scheme Liability**

93.     Securities and Exchange Commission Rule 10b-5, subsections (a) and (c), make it illegal "to employ any device, scheme, or artifice to defraud" and "to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  This prohibition is also known as "Scheme Liability."  The Defendants each, and in combination with Non-Party Conspirators including Agar, AXIA Capital Bank, AXIA Operations Ltd., and Federkiewicz, among others currently unknown, created and operated their fraudulent or deceitful scheme in the manner described in paragraphs 24 through 88, above, and summarized in detail below.

## The Fraudulent Scheme

94.     At some point prior to April of 2020, and on information and belief, sometime in 2019 or earlier, AXIA and Agar, with the help of others, developed a new cryptocurrency (AXC) that, they would initially claim, could be distinguished from other then-available cryptocurrencies, and therefore be more desirable, because unlike the commonly available fiat cryptocurrencies at the time, its value was not based purely on speculation and market trends, supported by faith in its issuer, but was asset-backed, stable, could be stored in a reliable and faithful bank, and which could reliably be used by the holder as an international form of payment for goods or services, like any other stable currency held in a legitimate bank.

95.     AXIA and Agar had no intention of maintaining an asset-backed, stable AXC for long, but to get broad public awareness of AXC, they needed to project the appearance of asset-backing.  Because they, themselves, had insufficient backing to truthfully market their AXC as asset-backed, they recruited Federkiewicz and other entities that were in a position to identify

potential Founders, and convince those Founders to make pledge their valuable assets to support their scheme.

96.    AXIA, Agar, Federkiewicz, the Non-Party Conspirators and other individuals and entities that developed this initial cryptocurrency scheme were necessarily aware that the magnitude of funds needed from the Founders would be enormous.  AXIA, Agar, Federkiewicz, and other entities knew that AXIA could not maintain its asset-backed nature into the foreseeable future, and that they could never give the Founders the consideration they were entitled to in exchange for their participation in the project, while at the same time allowing AXIA, Agar, Federkiewicz, and other entities to reap large profits for themselves during the first years of the scheme's operation.  AXIA, Agar, Federkiewicz, and other entities would either need to delay receiving large profits for several years, or defraud Founders into pledging assets by making promises they had no intention of honoring.

97.    AXIA, Agar, Federkiewicz, and other entities chose the latter option.  AXIA, Agar, Federkiewicz, the Non-Party Conspirators, and other initial scheme participants agreed they would make the promises necessary to Founders to attract their participation, and not disclose to the Founders their intentions of preventing the Founders from exercising their contractual rights, or of jettisoning the asset-backed feature of AXC after AXC had sufficient public exposure.  This portion of the scheme was applied to, and affected, all AXIA Founders, including Plaintiffs.

98.    In order to promote their scheme on a wide scale, the Defendants utilized AXIA Operations Ltd., and likely other Non-Party Conspirators, to distribute their marketing material through the internet, to establish a communication channel and as an entity for making investments, and to establish an internet-based options platform that gave the appearance of a legitimate options holding and trading platform.  The Defendants also established AXIA Capital

Bank to front as a legitimate bank where investors could purchase and store AXC and other currency, deposit money, especially U.S. dollars, transact business with debit cards, and freely make exchanges between AXC and other currencies.  At the time, the Defendants were aware they did not have sufficient liquid assets to fund AXIA Capital Bank, and they were not likely to have sufficient liquid assets into the foreseeable future, and therefore AXIA Capital Bank would be incapable of fulfilling its banking obligations.  Neither the Plaintiffs nor other investors had access to this information, and it was not disclosed to them by the Defendants.  This portion of the scheme was applied to, and affected all investors in AXIA, including the Plaintiffs.

99.    The Defendants needed the Plaintiffs to keep their assets committed to AXIA until AXIA no longer needed them for marketing purposes, and to refrain from taking any legal action against them once they realized the Defendants had no intention of allowing the Plaintiffs to have the compensation promised to them in the Agreements.  To delay any action by the Plaintiffs, the Defendants provided the Plaintiffs with a sweeping set of excuses for their actions, and omitted crucial facts that would have lessened the harm to the Plaintiffs.  Defendants hired two separate auditing firms, first the Grant Thornton firm, and then Berkower, to perform audits of the assets contributed by the Founders.

100.    Berkower, AXIA's global partner,[5] performed a particularly extensive audit on the value, location, and ownership status of the assets contributed by Axtra to the AXIA project.  Berkower concluded its audit of Axtra's assets by announcing to Axtra and the general public that Axtra's assets were not only properly valued, but also that they were properly assigned and installed into the AXIA project and that, in exchange, Axtra properly received AXC and options to AXC per its investment Agreements with AXIA.

---

[5] https://axia.global/globalcontributors

101.   Axtra does not doubt that its assets were properly valued, because Berkower's assessment of their value matched the prior assessments by AXIA, Agar, and Federkiewicz.  But Berkower either misrepresented to Axtra and the general public that Axtra's assets were properly assigned and installed, or purposefully failed to disclose that AXIA did not consider them so, that AXIA did not issue valid AXC and options to Axtra, and that AXIA would not ever do so.  These misrepresentations or omissions by Berkower were calculated to mislead Axtra into believing that AXIA would in fact honor the Agreements it signed with Axtra.  The plan worked.  Axtra relied on Berkower and delayed either removing their assets from the AXIA project, or taking legal action against AXIA, for over a year, based on Berkower's audit and subsequent report.

102.   While Axtra relied on the representations and actions of AXIA, Agar, Federkiewicz, and Berkower, the Defendants began executing the next portion of their scheme. The Defendants orchestrated what they later called a "promotional" launch of AXC on a public trading platform (Bitmart) that created, as AXIA phrased it, a "fake market," and opened AXIA Capital Bank for business with the general public.  The fake market caused the publicly visible price of AXC to skyrocket in value, but the trading was artificially limited by AXIA to a very small volume and was conducted with the help of confederates of AXIA or, as AXIA characterized them, "market makers," to manipulate the AXC market.  With this fake AXC market, the Defendants sought to, and did, attract investment into AXIA Capital Bank, where depositors could purchase a nearly unlimited volume of AXC directly from AXIA Capital Bank, rather than through a third-party exchange, could safely deposit either cryptocurrency or U.S. dollars, and were led to believe that they could freely exchange their forms of currency between AXC and U.S. dollars.

103.   While the Defendants were attracting large-scale public investment into AXIA Capital Bank, they froze the bank account that they, themselves, established for Axtra, where

Axtra's AXC was held so that Axtra was unable to benefit from any AXC transactions.  Even with their AXC frozen, Axtra could have earned interest on their AXC deposited in AXIA Capital Bank, like other bank account holders, but without any explanation from AXIA Capital Bank, it refused to credit Axtra's account with any interest.  Worse, while Axtra was ultimately able to wire money into its AXIA Capital Bank account so that it could purchase its options, the Defendants prevented Axtra from exercising any of its options by any method, either through direct purchase or through a cashless options exercise.  These actions prevented Axtra from making any benefit whatsoever from the "compensation" it purportedly received for contributing $5.8 B of assets to AXIA for the success of the project.

104.    There is no doubt that the Defendants controlled and used what was otherwise publicly presented as a legitimate banking institution, AXIA Capital Bank, to execute their fraudulent investment scheme.  A startling example of this unlawful control and use is the Defendants' Motion to Dismiss, Dkt. 8.  AXIA Capital Bank is not a Defendant in this lawsuit, yet in their publicly filed motion, the Defendants attached as Exhibits A-4 (Dkt. 8-4), and A-5 (Dkt. 8-5), documents that they could only have received from AXIA Capital Bank.  These documents were each disclosed to AXIA Capital Bank in confidence, as part of AXIA Capital Bank's KYC policies, and were demanded by AXIA Capital Bank soon after the Defendants unilaterally established an account for Axtra at that bank.

105.    While these events were occurring, Axtra did not know that the Defendants intended to formally disenfranchise Axtra from any of the consideration it purportedly received in exchange for the assets it pledged to AXIA, and encumbered for years, pursuant to the Agreements.  Without any notice to Axtra, AXIA made two public announcements concerning its AXC.  First, AXIA announced that it would split AXC at 13.43: 1, which increased the volume held by each

investor by a factor of 13.43, and simultaneously reduced the value of AXC from $13.43 to $1.00. Second, AXIA announced that it would change the technical nature of its AXC from the existing ERC 20 form to a new form, and that all original AXC would become worthless.

106.    Along with these announcements, AXIA informed Axtra that if it wished to continue to own AXC of any value, it would need to agree to sweeping amendments to the Agreements it signed with AXIA, and without any compensation for doing so.  Among those changes demanded by AXIA were 1) Axtra would need to cancel amendments to the ICO Agreement in its entirety; 2) Axtra would need to agree that any dispute with AXIA would need to be resolved exclusively in Dominica, where the interim attorney general was acting as AXIA's private lawyer, and 3) Axtra would need to agree that all of its AXC, and any AXC it might obtain from the exercise of options must be frozen for a period of two years.  Notably, at the time AXIA made these demands, the Defendants failed to inform Axtra that AXIA's position was, and always had been, that Axtra was *never* issued any valid and usable AXC or options in the first place.  Had Axtra agreed to these changes, Axtra would never have received any useful AXC or options to AXC and would have contractually agreed to resolve this dispute in a foreign venue with a questionable judicial arrangement.

107.    The Defendants then prevented any investors in AXC from withdrawing any funds whatsoever from AXIA Capital Bank through the use of the payment cards that AXIA Capital Bank itself issued to its account holders, after collecting an issuance fee from account holders.

108.    The Defendants completed the execution of their scheme to defraud when, after this lawsuit was filed, they first disclosed to Axtra that AXIA had never actually given Axtra any consideration for its participation in the project, as detailed above.

109.     By taking the actions, as described in detail, above and summarized in paragraphs 24 through 88, the Defendants employed a scheme to defraud Axtra in connection with its purchase, and the Defendants' sale of a security, in violation of Rule 10b-5(a).

110.     The Defendants engaged in the acts, practices, and course of business described in detail in paragraphs 1 through 109, above and summarized in paragraphs 24 through 88, which operated as a fraud or deceit upon Axtra in connection with its purchase of, and the Defendants' sale of a security in the AXIA project.  By doing so, the Defendants violated Rule 10b-5(c).

### 2.  **Subsection 10b-5(b) Liability**

111.     In addition to creating and operating a fraudulent scheme, the Defendants also made numerous fraudulent and express misrepresentations and fraudulent, material omissions to/from the Plaintiffs, and conspired with one another in furtherance of their effort to advance their scheme and to profit from the Plaintiffs' assets.

### <u>Misrepresentations</u>

112.     Examples of the fraudulent and express misrepresentations made by the Defendants to the Plaintiffs, in furtherance of their scheme, include the following:

(a)     On April 13 and 14, 2020, AXIA, through Federkiewicz, sent marketing documents to Axtra, claiming AXIA would be "digital currency with underlying value," would have "complete transparency," would have a "finite supply that will be set at the [ICO],' would have intrinsic value that could be confirmed with an "asset base," that the "project is fully funded," and that the project had "a targeted launch prior to the end of Q2/20."  Each of these representations were false, and AXIA and Federkiewicz necessarily knew they were false when made, or made the representations with reckless disregard for their truth.  AXIA and Federkiewicz were in possession of AXIA's own financial and

technical status, knew they could not launch in time, knew they were not fully funded to operate a marketing system for a launch, knew they had insufficient liquid funds to operate a bank, and knew they could not maintain an asset-backed currency without severely limiting their own immediate profit goals.

(b)     The marketing brochure Federkiewicz sent on AXIA's behalf on April 14, 2020 also represented that Axtra, as an ICO participant, would "receive AXIA Coin plus Options" in "an offering that provides a near risk free opportunity to participants." AXIA and Federkiewicz knew these representations were false when they were made, or they were made with reckless disregard to their truth. As finally admitted by AXIA's lawyers near the time this suit was filed, AXIA never intended that Axtra would receive digital currency that would have any value to Axtra, never intended for Axtra to receive options it could exercise, and despite their many prior representations otherwise during the interim, never actually received useable AXC or options.

(c)     On June 4, 2020, Federkiewicz, on behalf of AXIA told Axtra that AXIA had agreed with the designated value of Axtra's assets, and that AXIA "came up with the amounts." As recently admitted by AXIA's lawyers, those statements were knowingly false.

(d)     On June 5, 2020, AXIA signed an agreement with Axtra, prepared by AXIA, that represented that that the Appleby (Cayman) law firm was legal counsel to each of AXIA, The Foundation, and the Axtra Trust. This representation was false or recklessly made with respect to its truth or falsity, because AXIA thereafter employed that same Appleby firm in legal communications against Axtra.

(e)     On June 29, 2020, Federkiewicz, on behalf of AXIA, wrote to Axtra to say that he was unaware of any issues with the audit of Axtra's assets, and that "[i]f anything comes up I will advise immediately." This was false. As admitted by Axtra's lawyers, AXIA had taken the position from the beginning that Axtra's assets would not result in any compensation to Axtra, and neither Federkiewicz nor AXIA revealed any issues with Axtra's assets until at or near the time this lawsuit was filed.

(f)     On January 19, 2021, Agar, AXIA's CEO, told Axtra that AXIA's auditor would provide documents to confirm that Axtra's assets had been properly handled in the transaction. The next day, January 20, 2021, Agar sent the documents to Axtra, confirming that "this is the final requirement." The documents Agar sent represented that Axtra's "asset(s) were contributed for the benefit of the AXIA Foundation in exchange for AXIA tokens," that those tokens were "issued in exchange for the Redeemable Trust Units," and that Axtra "is hereby granted an option to acquire two (2) Tokens for each Token issued in exchange for the Redeemable Trust Unit." Each of these statements were misrepresentations. AXIA's lawyers have recently confirmed that Agar and AXIA never believed that Axtra's assets were properly contributed, or that Axtra had properly been awarded actual AXC or options, or that these were the final requirements for Axtra. As a result of Axtra's reliance on these misrepresentations, Axtra has suffered significant financial damage.

(g)     On January 22, 2021, Federkiewicz, on AXIA's behalf, told Axtra that AXIA required Axtra to confirm its assets were owned by Axtra LLC, and that there were no additional requirements of documents. Federkiewicz went on to state that with this confirmation, Axtra would not be at risk of losing its AXC or options. As explained by

AXIA's lawyers near the time this lawsuit was filed, this has never been AXIA's position. AXIA actually would require documents confirming a different owner of its assets.

(h)     In March of 2021, AXIA publicly announced, through its website, a change to the manner in which it would administer the exercise of options to AXC.  AXIA represented that now, through the new web-based AXIA Options Platform, holders of options would be "in complete control as to how to manage the options," could "manage your options however you see fit," and that the options could be exercised by direct purchase, or sold directly to the market in a cashless manner."  This was an outright misrepresentation.  Near the time this lawsuit was filed, AXIA admitted to Axtra that it never intended that Axtra could ever exercise any of its options in any manner, or at any time.

(i)     On April 11, 2021, Agar, AXIA's CEO, told Axtra that "the absolute last thing [Berkower] will ask for" is the opportunity to call each of Axtra's asset contributors. This was false.  At the same time, Agar knew AXIA was taking the position that Axtra had not performed all steps necessary to receive actual AXC or options.  Axtra relied on Agar's representation and took no further actions because they were never thereafter identified by AXIA, until near the time this lawsuit was filed.

(j)     Between April 5 and May 12, 2021, AXIA published Berkower's report, dated November 30, 2020, confirming that Axtra had transferred "legal and beneficial title of the designated assets, free of any beneficial interest and any security interests and together with all accrued benefits and rights attaching or accruing to such assets to AXIA in exchange for AXIA Tokens."  Because AXIA has now admitted that it never believed Axtra had properly transferred its assets to the AXIA project, Berkower's statement in its

November 30, 2020 report, published by AXIA, the Defendants could not have believed that report was truthful at the time it was published.

(k)     On June 23, 2021, Agar, AXIA's CEO, told Axtra that "AXIA accepted the (Axtra) assets", and that "Axtra received 2 options for every one AXIA Token."  Then on June 29, 202, Agar confirmed to Axtra that its assets were within the AXIA project.  These statements were knowingly false at the time they was made, or made with reckless disregard for their truth.  AXIA recently admitted that AXIA had never truly accepted Axtra's assets, and that Axtra had never received useable options to AXC.

<u>**Omissions**</u>

113.     In addition to Defendants' fraudulent misrepresentations, Defendants failed to disclose information, which, given their prior representations, should have been disclosed in order to avoid Plaintiffs from being deceived by the prior representations.  Examples of Defendants' fraudulent, material omissions withheld from Plaintiffs in furtherance of their scheme include the following:

(a)     On June 29, 2020, Federkiewicz, on behalf of AXIA, wrote to Axtra to say that he was unaware of any issues with the audit of Axtra's assets, and that "[i]f anything comes up I will advise immediately."  As admitted by Axtra's lawyers, AXIA had taken the position from the beginning that Axtra's assets would not result in any compensation to Axtra, and neither Federkiewicz nor AXIA revealed any issues with Axtra's assets until at or near the time this lawsuit was filed.  This was an omission of a material fact, on which Axtra relied to its detriment.

(b)     On December 21, 2021, Axtra's Managing Member inquired of Agar, on behalf of AXIA, how the process of delivering a Redeemable Trust Unit in exchange for

AXC and options worked, specifically for the unique situation in which Axtra found itself – AXIA had already delivered AXC and options to Axtra.  Instead of informing Axtra of any additional steps Axtra or the Axtra-Trust would need to take, Agar simply told Axtra that AXIA would provide instructions for any additional required steps "at the appropriate time."  This was an omission of a material fact on which Axtra relied, to its detriment. Agar omitted disclosing that AXIA was taking the position that, even though AXIA create the illusion that Axtra received AXC and options, AXIA was taking the position that Axtra needed to take additional, and nonsensical steps to actually receive AXC and options.

(c)     On January 20, 2021, AXIA's CEO, Agar, informed Axtra that Axtra's completion of certain documents drafted by AXIA's auditor Berkower were the "final requirement" for Axtra.  But Agar omitted the fact that he always knew AXIA would require several additional requirements, as finally admitted by AXIA near the time this lawsuit was filed.

(d)     Also on January 20, 2021, AXIA, through Agar, represented to Axtra that, "as a condition to Axtra receiving AXC tokens and options per the ICO agreement" Axtra needed each of its contributors to confirm that Axtra LLC owned the assets.  AXIA failed to mention that AXIA's actual position was that it would require confirmation that the same assets were owned by the Axtra-Trust, and not owned by Axtra LLC.  This was an omission of a material fact, which harmed Axtra when it believed Agar's representation.

3. **Damages**

114.   Plaintiffs relied on Defendants' misrepresentations, and were deceived by Defendants' omissions of material fact that Defendants committed in the execution of their scheme to defraud, as described above.  Among the damages suffered by Plaintiffs are:

(a) The total loss of all of the AXC that Defendants deceived Plaintiffs into believing Axtra received;

(b) The loss of all interest on AXC that was placed by AXIA into Axtra's AXIA Capital Bank account;

(c) The total loss of all options that Defendants deceived Plaintiffs into believing Axtra received;

(d) Loss of the opportunity to sell options to third parties;

(e) Loss of the opportunity to exercise options to AXC at the times when Axtra could have sold the resulting AXC above the cost to exercise the options;

(f) Loss of the opportunity to monetize Axtra's assets during the period of time they were pledged to the AXIA project;

(g) Significant attorneys' fees and costs.

**COUNT 2:     VIOLATION OF 18 U.S.C. §§ 1961 *et seq*, 1962 (RICO)**

115.     Plaintiffs restate each and every allegation contained in Paragraphs 1 through 114, above.

116.     In the alternative to their allegations of securities laws as stated in Count 1 above, the Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1962 to 1968 (Civil RICO).  The Defendants and their Non-Party Conspirators have associated with themselves and with other entities to form a RICO enterprise, and a scheme to defraud, that has affected interstate and international commerce, through a sustained pattern of racketeering activities, all of which has harmed the Plaintiffs.

117.     RICO prohibits the following conduct:

It shall be unlawful for **[1]** any person **[2]** employed by or associated with **[3]** any enterprise **[4]** engaged in, or the activities of which affect,

- 45 -

interstate or foreign commerce, **[5]** to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs **[6]** through a pattern of racketeering activity or collection of unlawful debt. 18. U.S.C. § 1961-68 (numbering added to text of statute)

The facts as alleged herein establish that each of the requirements of RICO liability are met with respect to each of the Defendants.

i. **Each Defendant is a RICO "Person" Associated with a RICO Enterprise, are Distinct From the RICO Enterprise, and Participated in the Conduct of the Enterprise's Affairs**

118.   RICO defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[6]  The Defendants and at least their Non-Party Conspirators have agreed among themselves, expressly or tacitly, to act in unison to convince legitimate investors, including Axtra, to invest an enormous volume of assets needed launch the AXIA project, while never intending to compensate those investors, and to deceive those investors concerning the reasons why they did not receive the compensation they were promised.  The Defendants together with the Non-Party Conspirators, as identified in paragraphs 8 through 12, above, have acted as an "association-in-fact" for a common purpose, have and maintained relationships between and among each other (and nonparties), and the association-in-fact has a longevity sufficient to permit those associates to pursue the enterprise's purpose.

119.   Each Defendant and their Non-Party Conspirators has an existence that can be defined apart from the commission of the predicate acts constituting the pattern of racketeering activity.  That is, each of these Defendants has a separate, individual or legitimate existence as an individual or an operating business.

---

[6] 18 U.S.C. § 1961(4).

120.     Each Defendant and their Non-Party Conspirators is a "person" for purposes of the RICO Act.  A RICO "person" includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).  A RICO person can be either an individual or a corporate entity.  As individuals or corporations, the Defendants and their Non-Party Conspirators are RICO persons.

121.     An entity can be both a RICO "person" and part of another RICO "enterprise."  All Defendants and their Non-Party Conspirators systematically committed the RICO violations, and are thus also RICO "persons" separate from the RICO "enterprise" at issue here.

122.     The Defendants and their Non-Party Conspirators are distinct from each other. Each of these entities is distinct from their collective RICO enterprise because they are functionally separate, perform different roles within the enterprise or use their separate legal incorporation or existence to facilitate racketeering activity. Each of these entities is thus responsible for different activities in the scheme.

123.     There is also an identifiable framework within the "enterprise" here capable of consensual decision making that is separate from and would still exist even apart from the predicate acts alleged here.  These Defendants established a central cryptocurrency project – the AXIA project, that required entities to be primarily responsible for the separate functions of marketing, computer programming, contracting, auditing, banking, and holding assets.  As alleged, specific members of the enterprise primarily accomplished these functions, with assistance from the others.

124.     As described in detail above and in paragraphs 126-133 below, in addition to their own primary role, each Defendant and their Non-Party Conspirators conducted, or participated directly and indirectly, in the conduct of the RICO enterprise's affairs.  These entities agreed that

each would execute the scheme to defraud others, including Axtra into investing in the AXIA project.

125.    The conduct of the scheme to defraud, described in paragraphs 94 through 110, above required coordinated activity because none of them could accomplish their scheme without the timely assistance of the others.  For instance, AXIA Issuer could not have contracted with Axtra unless Agar and AXIA Operations Ltd. had first created the cryptocurrency and related services and Federkiewicz had first lured Axtra into considering investment into the project.  Axtra could not have initially been convinced it received the compensation it was promised unless AXIA Capital Bank first represented it held Axtra's AXC, and unless Berkower first conducted audits and reported that Axtra had received what it was promised.  These activities, performed in perfect sequence, demonstrate a coordinated course of conduct.

### The Identities and Roles of Persons Forming the RICO Enterprise

126.    The members of the RICO enterprise, including each Defendant along with the Non-Party Conspirators, are the following entities, identified and described with their role in the enterprise.  Each of these entities has an existence that is separate from the other, and from the RICO enterprise.

127.    **Defendant, AXIA Issuer, Inc:**  Its known purported legitimate business is to act as the legal custodian of AXC and options to purchase AXC, and an administrator for the AXIA system to sign contracts for investment into AXIA, and coordinate the safekeeping of AXIA assets. Its role in the RICO enterprise was to offer and enter into purportedly valid contracts with Plaintiffs by making false representations to Plaintiffs concerning the meaning and interpretation of those contracts, AXIA's intent to honor those contracts, AXIA's plans for the timing of its public launch, and the characteristics of the AXC.  In this role, it induced Plaintiffs to enter into the Agreements.

It then helped coordinate the activities of other enterprise members, inducing them to breach the terms of the Agreements and to prevent Axtra from exercising its contractual rights.

128.    **Defendant, The AXIA Foundation:**  Its known purported legitimate business is to act as the holder of the Founders' assets and AXC not yet issued to investors, and to play a role in securing assets for backing and collecting redeemable trust units.  Its role in the RICO enterprise was to fraudulently convince Plaintiffs that Axtra's assets were fully and properly vested in the AXIA project, and when convenient for the enterprise, to claim that they were not.  It also assisted with the management and coordination of other enterprise activity.

129.    **Defendant, Berkower LLC:**  Its known purported legitimate business is to function as an accounting and auditing firm.  Its role in the RICO enterprise was to audit Axtra's assets, communicate with Axtra's contributors, and develop and publish a detailed report specifically focused on the assets of the Founders, including Axtra, that was designed to deceive Plaintiffs into believing they had contributed their assets in a manner acceptable to AXIA, and had received actual, negotiable AXC and exercisable options to AXC.

130.    **Nick Agar:**  His known purported legitimate existence is to act in his own self-interest as an individual holding cryptocurrency and money, and act as the Chief Executive Officer of AXIA Issuer, Inc.  His role in the RICO enterprise, on behalf of both himself as an individual, and as an officer of AXIA Issuer, Inc., was to act as one of the overall managers of the enterprise, fraudulently induce Plaintiffs to enter the Agreements, fraudulently convince Plaintiffs that they were not purchasing a security, convince Plaintiffs to keep their assets in the AXIA project until AXIA no longer needed them, fraudulently convince Plaintiffs that AXIA intended to respect Axtra's contractual rights and profit from its investment, oversee the fraudulent marketing of AXC and the fake launch of AXC, periodically have meetings with Plaintiffs' representatives by

electronic means to provide misinformation and allay any of Plaintiffs' concerns, coordinate the disenfranchising of Plaintiffs from any of their AXC or options, and, on information and belief, to personally make money through the sale of AXC through non-public channels.

131.   **AXIA Capital Bank:**  Its known purported legitimate business is to act as a bank for international account holders, where it maintains the AXC and U.S. dollars deposited by those account holders.  Its role in the RICO enterprise was establish an account for Axtra to hold its AXC, and at the direction of Agar, AXIA Issuer, Inc., and The AXIA Foundation, freeze Axtra's AXC holdings, refuse to award interest to Axtra on its holdings deposited in its bank, prevent Axtra from exercising any of its options, and to collect confidential information from Axtra's members, under the guise of performing KYC policy operations, and providing that confidential information to AXIA Issuer, Inc. and The AXIA Foundation to be used for their non-banking uses.

132.   **AXIA Operations Ltd:**  Its known purported legitimate business is to provide custom computer programming services, collect information on the AXIA project, operate the official AXIA website, coordinate marketing efforts among other AXIA partners, communicate with AXIA investors and potential investors, and market the AXC, AXIA Capital Bank, and the overall AXIA project with timely and truthful information.  Its role in the RICO enterprise was to manage the website so that it could strategically publish misinformation about AXIA's business plans, the nature and value of AXC, and AXIA's intentions with respect to the beneficial features of AXIA Capital Bank and AXC itself.

133.   **Trevor Federkiewicz and 12 Peers Capital Markets, Ltd.:**  Together referenced as "Federkiewicz," its known purported legitimate business is acting as an international securities and assets broker for securities and assets not related to the AXIA project, and to personally profit from its involvement in the AXIA project.  Its role in the RICO enterprise was to assist with the

management of AXIA's efforts to fraudulently induce Founders, including Axtra, to invest in the AXIA project, to deceive Axtra into believing its assets were fully and properly accepted by AXIA and assigned to the AXIA Foundation and to deceive Axtra into believing it had actually been awarded marketable AXC, and exercisable options to AXC.

### ii. The Defendants Engage In Activities that Affect Interstate and Foreign Commerce

134.    Each member of the RICO enterprise engaged in, and/or each's activities affect, interstate and foreign commerce.   Axtra is a Wyoming company, AXIA Issuer, Inc. is domiciled in the British Virgin Islands, AXIA Foundation is domiciled in Dominica, Berkower is domiciled in New Jersey and has operations throughout the United States, Agar is domiciled in Canada, AXIA Operations Ltd. is domiciled in Canada, AXIA Capital Bank is domiciled in Dominca, and Federkiewicz, individually a Canadian citizen, whose 12 Peers Capital Markets Ltd. has a principal place of business in the Cayman Islands.  Each member of the RICO enterprise used the wires to advertise, to conduct business, and to communicate with each other between their places of business, and to communicate to Plaintiffs, Plaintiffs' members, and their counsel in multiple states of the United States, Switzerland, and Italy, and affected the business and financial condition of Plaintiffs in multiple states of the United States, Switzerland, and Italy.

### iii. The RICO Enterprise Participated in a Pattern of Racketeering Activity Over an Extended Period With Threat of Repetition

135.    RICO requires a "pattern of racketeering activity." A "pattern of racketeering activity" is one that is performed by at least two acts of racketeering activity, or violations of a "predicate" offense (an act "indictable under any of" certain provisions of" 18. U.S.C. § 1961 (1) (D)). *See* 18 U.S.C. § 1961(5).  A "pattern of racketeering activity" can be a past conduct that by its nature projects into the future with a threat of repetition.  It can also be conducted over a closed

period through a series of related predicates extending over a substantial period.  Both of these apply here.

136.    The Defendants' pattern of racketeering activity began by at least April of 2020, when Non-Party Conspirator, Federkiewicz, on AXIA's behalf, prepared and sent a draft ICO agreement to Plaintiffs.  For a period of almost three years, the Defendants have continuously used the wires since that time to at least (1) attract investors' interest in AXC and AXIA Capital Bank, (2) purchase AXC, (3) establish accounts at AXIA Capital Bank, (4) deposit funds in AXIA Capital Bank, (5) make specific communications with individual investors, such as Axtra.  As detailed above, the RICO enterprise continuously and systematically used the wires specifically concerning Axtra to defraud Axtra into signing the Agreements, fraudulently induce Axtra to commit its assets to AXIA, prevent Axtra from obtaining any value from its AXC deposited in AXIA Capital Bank and also Axtra's options, mislead Axtra concerning its status within the AXIA project and the reasons why it was unable to exercise any options.  The pattern of racketeering continues to this day, with the enterprise communicating by wire via e-mails or the internet with each AXIA investor, and with Axtra in particular, concerning the status of their AXC and options, the current status of the AXIA project, and the future plans for AXIA.  Each instance of mail or wire fraud, as detailed more fully below, is a separate RICO predicate act.

### A. Used and Caused Fraudulent Wire Communications in Violations of 18 U.S.C. § 1343

137.    Wire fraud occurs when an individual devises a plot to defraud and subsequently uses wire means in furtherance of it. 18 U.S.C. § 1343.  Importantly, a wire fraud occurs when an enterprise merely uses wire means in the furtherance of the fraudulent scheme, regardless of whether the wired communications are themselves fraudulent.  Here, the RICO enterprise used and caused to be used mail and wire means to both: (1) further their fraudulent scheme, and (2)

send fraudulent communications.  These uses of the wires are an essential component of the scheme to defraud.  Wire fraud is an enumerated predicate acts that constitute RICO "racketeering activity" under Section 1961(1)(D).

138.  The Defendants' fraudulent scheme is outlined in detail in paragraphs 24 through 110 above.  As alleged in this complaint, the use of wires was essential to furthering the AXIA project scheme.  It is undeniable that the Defendants and their Non-Party Conspirators used the wires of the U.S. to at least (1) attract investors' interest in AXC and AXIA Capital Bank, (2) purchase AXC, (3) establish accounts at AXIA Capital Bank, (4) deposit funds in AXIA Capital Bank, (5) make specific communications with individual investors, such as Axtra, concerning the Agreements and each of the prior enumerated purposes.  This widespread use of the wires, even when no misrepresentations were made, is wire fraud when used to further a fraudulent scheme.

139.  However, the enterprise members also used the wires of the U.S. to communicate fraudulent representations in furtherance of their scheme.  Examples of wires sent by enterprise members include those instances detailed above.

**B.  Engaged in Financial Institution Fraud in Violation of 18 U.S.C. § 1344**

140.  An entity commits brank fraud when it knowingly executes, or attempts to execute, a scheme or artifice – (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of a financial institution, by means of false or fraudulent pretenses, representations, or promises.  18 U.S.C. § 1344.

141.  The RICO enterprise here used their scheme to obtain Axtra's property (i.e. the consideration to which Axtra was entitled, pursuant to the Agreements) deposited in AXIA Capital Bank.  This property comprises the entirety of Axtra's 2.8B AXC, and interest on Axtra's 2.8B

AXC.  By confiscating all of Axtra's AXC and interest on that AXC, the Defendants committed bank fraud.

142.    The RICO enterprise could not accomplish the confiscation of Axtra's AXC and interest overnight.  As described above, the process they used to confiscate these assets was conducted over a period of approximately two years, starting on or about June 5, 2020, when the Agreements were executed, and was finished by August 19, 2022, when AXIA confirmed to Axtra that Axtra no longer owned any AXC having any value in AXIA Capital Bank.

**C.  Engaged in Extortion in Violation of 18 U.S.C. § 875(d)**

143.    18 U.S.C. § 875(d) provides that a person commits the offense of extortion when that person "with intent to extort from any person, firm, association, or corporation, any money or thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property […] of another …"

144.    When Defendants and their Non-Party Conspirators, using the wires of the United States, threatened Axtra with the total loss of its AXC, its options to AXC, and any interest on its AXC unless Axtra gave back to AXIA valuable terms of its Agreements with AXIA, gave up its rights to immediately exercise its options and make transactions with the resulting AXC, and submit to the exclusive jurisdiction of Dominica, as described above, including in paragraph 45, above, they engaged in extortion.

145.    The extortive demands of Defendants and their Non-Party Conspirators caused damage to Plaintiffs, and Defendants actually followed through with their threats to harm Plaintiffs.

**iv.    The Defendants Acted with Intent and Scienter**

146.    The Defendants and each of the RICO enterprise members, including the Non-Party Conspirators, acted with requisite intent to establish, perpetuate and/or carry out the scheme to defraud. Each of these Defendants acted with either specific intent to defraud or with such recklessness with respect to the false or misleading information wired in furtherance of the enterprise or otherwise so as to constitute requisite *scienter* to commit mail and wire fraud. As detailed in paragraphs 48 and 64 through 88, above, that *scienter* is demonstrated at least by the admissions that AXIA's lawyers finally made to Plaintiffs near the time this lawsuit was originally filed.

147.    In addition, it is not plausible that Defendants and the Non-Party Conspirators did not know their own financial status when they stated they were adequately financed to formally launch the AXIA project on April 13, 2020, and thereafter. It is also not plausible that Defendants and the Non-Party Conspirators were not aware it was financially infeasible for them to continue to maintain AXC as an asset-backed currency, given their profit goals, when they promised AXC would be an asset-backed currency on April 13, 2020, and thereafter.  Further, it is not plausible that Defendants and the Non-Party Conspirators did not know they did not consider Axtra's assets to be properly deposited in the AXIA project in January of 2021 and thereafter, when they confirmed to Axtra and the general public that they were so deposited.  When Defendants told Axtra on multiple occasions that it had received valid AXC and options starting at least by January of 2021, they had to know this was false, given their recent admissions that, from the beginning, they never intended to provide Axtra with marketable AXC or exercisable options.

### v.    The RICO Enterprise has Proximately Caused Plaintiffs' Injury to Business or Property

148.    Plaintiffs were injured in their business or property by reason of Defendants' violation of 18 U.S.C. § 1962.  *See* 18 U.S.C. §1964(c).  Sections 1964 (a), (c) and (d) authorize

persons "injured" in their "business or property," "by reason of" RICO's "violation" to sue for appropriate redress, including equitable relief, treble damages and attorneys' fees.

149.     Establishing a proximate cause of a RICO "scheme to defraud" requires only showing use of the mail or wire in furtherance of a scheme to defraud and an injury proximately caused by that scheme. Proximate cause exists where there is some direct "relation between the injury asserted and the injurious conduct alleged."[7] Considerations of foreseeability, directness, and logic are parts of RICO-related proximate cause.

150.     Although first-party reliance is not an element of a RICO claim, Plaintiffs relied on Defendants' misrepresentations, and were deceived by Defendants' omissions of material fact that Defendants committed in the execution of their scheme to defraud, as described above.  In addition to the Plaintiffs, the various legitimate business, agencies and governmental authorities that granted Defendants the authority and ability to establish websites, establish banking institutions, and used their services to send e-mail communications all relied on Defendants' implicit representation that they were conducting a legitimate business, and not operating a scheme to defraud.  Without these representations, Plaintiffs would not have been injured.  Among the damages suffered by Plaintiffs are those damages listed in paragraph 114, above.

**COUNT 3:     VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(c)**

151.     Axtra restates each and every allegation contained in Paragraphs 1 through 150, above.

152.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or

---

[7] *Anza v. Ideal Steel Supply Corp*., 547 U.S. 451, 462, 126 S.Ct. 1991, 1999 (2006).

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

153.   Each of the Defendants has violated Section 1962(c) and is liable, jointly and severally, for the business injury caused to the Plaintiffs by their actions

**COUNT 4:     VIOLATION OF 18 U.S.C. §§ <u>1961</u>(5), <u>1962</u>(d)**

154.   Axtra restates each and every allegation contained in Paragraphs 1 through 153, above.

155.   Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

156.   The RICO Defendants have participated in a conspiracy to engage in the conduct referenced in Count One.

157.   As stated above, each of these Defendants has participated in the scheme and their participation is necessarily a combination of more than two individuals.  The Defendants' creation, support or maintenance of the fraudulent scheme is illegal.  These Defendants with and through others have committed one or more overt acts to achieve or further the unlawful objects and purposes of the scheme detailed herein.

**COUNT 5:     COMMON LAW FRAUD**

158.   Axtra restates each and every allegation contained in Paragraphs 1 through 157, above.

159.   In Wyoming, and in virtually every other jurisdiction with civilized prohibitions against unethical behavior, the elements of common law fraud are:

   1.  the defendant made a false representation intended to induce the plaintiff to act;

   2.  the plaintiff reasonably believed the representation was true; and;

3.   the plaintiff relied on the representation and suffered damages as a result.[8]
by the representation.

160.   All of the elements of common law fraud are satisfied here. Defendants made false

representations of fact that caused Plaintiffs to act, and made false promises of future performance.

Among those false representations are those detailed above in paragraph 112.

## COUNT 6:   FRAUD BY NONDISCLOSURE

161.   Axtra restates each and every allegation contained in Paragraphs 1 through 160,

above.

162.   In Wyoming, as in virtually every other jurisdiction, defendants have a duty to make

a full and fair disclosure when they first give a false impression.  In evaluating a cause of action

for fraudulent nondisclosure, the Wyoming Supreme Court stated that even "[a]n 'as is' clause will

not relieve the sellers of the liability in the case of an actual misrepresentation or fraud."  Conduct

or words which tend to produce an erroneous impression may satisfy the plaintiff's burden in

proving fraud.  Even if someone is no under a duty to speak, if he does speak, he is under a duty

to speak truthfully and make a full and fair disclosure.[9]

163.   The elements of fraud by nondisclosure are satisfied here. Defendants made false

representations, and made false promises of future performance, and failed to disclose the true

facts when they had a duty to do so.  Among those false representations are those detailed above

in paragraph 112 and omissions in paragraph 113.

## COUNT 7:   BREACH OF CONTRACT

164.   Axtra restates each and every allegation contained in Paragraphs 1 through 163,

above.

---

[8] *Mantle v. N. Star Energy & Constr. LLC*, 437 P.3d 758, 786-87 (Wyo. 2019).
[9] *Alexander v. Meduna*, 47 P.3d 206, 215 (Wyo. 2002)

165.    AXIA fraudulently induced Axtra to enter into the Agreements.  In the event this Court determines that Axtra was not fraudulently induced into entering the Agreements with AXIA Issuer and The Foundation., and that Axtra entered into valid, enforceable written contracts with AXIA Issuer and The Foundation, then in the alternative, Axtra brings a claim for breach of contract.

166.    Axtra provided AXIA Issuer and The Foundation with valid consideration pursuant to the contracts it has with AXIA Issuer and The Foundation.

167.    AXIA Issuer and The Foundation have breached the written contracts with Axtra by at least the following:

    **i.**    Preventing Axtra from timely exercising any of its options – tantamount to taking those options away, or never issuing them to Axtra;

    **ii.**    Refusing to exercise any of Axtra's options – also tantamount to taking those options away, or never issuing them to Axtra;

    **iii.**    Refusing to "sell" any of Axtra's options for the benefit of Axtra, despite Axtra's written notice and request to do so, pursuant to the Agreements – also tantamount to taking those options away, or never issuing them to Axtra;

    **iv.**    Unilaterally devaluing Axtra's AXC by refusing to allow Axtra's AXC to earn interest - tantamount to issuing to Axtra a lesser amount of AXC required per the Agreements; and

    **v.**    Refusing to convert the technical form of Axtra's AXC to the new form, unilaterally created by AXIA, required for transactional purposes – tantamount to never issuing Axtra any AXC, or options to purchase AXC, at all.

168.    Axtra has been directly harmed because AXIA Issuer has caused the AXC owned by Axtra to become non-negotiable and valueless, and AXIA Issuer and The Foundation have caused Axtra's options to be near expiration, non-negotiable, and valueless.

169.    As a consequence of the breaches by AXIA Issuer and The Foundation, Axtra has also been monetarily harmed.  Axtra has been denied the opportunity to monetize any of its rights to AXC and to AXC options at a profit.

170.    Axtra has asked AXIA Issuer and The Foundation, in writing, to allow Axtra to exercise its options, but AXIA Issuer and The Foundation have refused these requests.

171.    Axtra has been forced to incur attorneys' fees and costs as a result of the several breaches by AXIA Issuer and The Foundation.

### COUNT 8:    TORTIOUS INTERFERENCE WITH CONTRACT

172.    Axtra restates each and every allegation contained in Paragraphs 1 through 171, above.

173.    Axtra entered into valid, enforceable written contracts with AXIA Issuer.

174.    Alternatively, in the event it is determined that The Foundation is not a party to these contracts (which it is by definition), The Foundation was aware that Axtra entered into valid and enforceable contracts with AXIA Issuer.

175.    The Foundation willfully and intentionally interfered with Axtra's contractual rights by, among other things, preventing Axtra from exercising, selling, or otherwise profiting from its options to AXC.

176.    These acts of interference by The Foundation proximately caused actual damages to Axtra in the form of the loss of the value of its options to AXC, and the loss of profits by preventing Axtra from exercising its options.

**COUNT 9:    PROFESSIONAL NEGLIGENCE (BERKOWER)**

177.    Berkower owed Plaintiffs a duty to use ordinary care in auditing Plaintiffs' assets and the ownership of those assets, and reporting to Axtra and to others concerning the status of Plaintiffs' assets and the ownership of those assets.  Berkower was engaged by AXIA to audit Plaintiffs' assets, and report on its findings.  At a minimum, Plaintiffs were an intended third-party beneficiary of that engagement.

178.    Berkower failed to exercise the ordinary care expected of an accounting and auditing firm with respect to Plaintiffs.  As a result of that failure, Berkower convinced Plaintiffs that Defendants considered Plaintiffs' assets to be properly included in the AXIA project, and that AXIA had in fact provided Axtra with valid and marketable AXC and exercisable options. Berkower's auditing and reporting also gave the other Defendants an improper means to convince Axtra to keep its assets in the AXIA project, and to delay taking legal action against AXIA.

179.    As a result of Berkower's professional negligence, Plaintiffs have suffered financial harm.

**COUNT 10:   OBLIGATION OF GOOD FAITH AND FAIR DEALING**

180.    Axtra restates each and every allegation contained in Paragraphs 1 through 179, above.

181.    After Axtra contractually encumbered its assets to AXIA Issuer, Defendants placed Axtra's AXC in AXIA Capital Bank, and placed Axtra's options in AXIA Options Platform.  From the moment Axtra's options were placed by Defendants into the institution chosen and controlled by Defendants, Axtra has never had the ability to sell, transfer, or exercise any of its options. Further, Defendants treated Axtra's AXC differently than other AXC.  For example, AXIA allowed other AXC holders in AXIA Capital Bank to earn interest on their AXC, while denying

that entitlement to Axtra.  Also, AXIA artificially devalued Axtra's AXC by implementing a 13.43 for 1 coin split for other holders of AXC but not Axtra.

182.     Over two years have passed since Axtra was entitled to its consideration, but it has been denied the opportunity to utilize any of that consideration.   During those two years, Defendants have provided Axtra with a continuous series of misrepresentations concerning Defendants' intentions with regard to Axtra's contractual rights, while apparently never intending to allow Axtra to exercise its right to enjoy its contractual consideration.

183.     Defendants have forced Axtra to bring suit to enforce its rights.   Defendants' actions are in bad faith and constitute a breach of the obligation of good faith and fair dealing.

### COUNT 11:   INJUNCTIVE RELIEF

184.     Axtra restates each and every allegation contained in Paragraphs 1 through 183, above.

185.     Given Defendants' actions and failures to act in light of Axtra's contractual rights and the obligations of AXIA Issuer, Inc. under those contracts, Axtra seeks preliminary and permanent injunctive relief, including an order requiring AXIA to:

  i.   Adjust all of Axtra's AXC to reflect AXIA's coin split of on or about April 28, 2022, in the format currently used by AXIA, and, at Axtra's option, to convert those AXC into the format that AXIA may use in the future;

 ii.   Fully release to Axtra all of its options to AXC;

iii.   Fully comply with Axtra's past and any future instructions and efforts to exercise its options; and

iv. Refrain from blocking or otherwise interfering with Axtra's efforts to transfer, sell, exercise, or otherwise monetize its options to AXC.

**VII.**
**CONCLUSION AND PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Axtra, LLC and The AXIA-Axtra Trust respectfully request that the Court enter judgment in their favor and against Defendants AXIA Issuer, The AXIA Foundation, and Berkower, LLC, and award Axtra, LLC and The AXIA-Axtra Trust the following relief:

(a) Preliminary and permanent injunctive relief, including an order requiring AXIA Issuer and its affiliates including The AXIA Foundation to:

    i. Adjust all of Axtra's AXC to reflect AXIA's coin split of on or about April 28, 2022, in the format currently used by AXIA, and, at Axtra's option, to convert those AXC into the format that AXIA may use in the future;

    ii. Fully release to Axtra all of its options to AXC;

    iii. Fully comply with Axtra's past and any future instructions and efforts to exercise its options; and

    iv. Prohibit AXIA from blocking or otherwise interfering with Axtra's efforts to transfer, sell, exercise, or otherwise monetize its AXC options.

    v. Require Defendants to include an obligation in any contract or agreement that transfers any of the assets of AXIA, including its cash, intellectual property rights, software or copyright rights, website rights, customer lists, investor lists, coin purchaser lists, or any other asset, that the purchaser or acquirer of any of these assets respect and comply with this Court's order or judgment awarding these assets to Axtra, as if the asset had not been acquired;

(b) Have from all Defendants the actual, consequential, and incidental damages caused

by AXIA's actions in an amount to be proven at trial;

(c) Have from all Defendants pre-judgment and post-judgment interest;

(d)  Have from all Defendants the costs of this proceeding and reasonable attorneys' fees;

and

(e) All other relief as may be necessary and proper.

Respectfully submitted April 17, 2023,

By:/s Travis W. Koch

    Travis W. Koch #7-5418
    Koch Law, P.C.
    121 W. Carlson St, Suite 3
    Cheyenne, Wyoming 82009
    307-426-5010
    tkoch@kochlawpc.com
    *Attorney for Plaintiffs*

    Emil Thomas Bayko
    Texas Bar No. 01864500 (*Pro Hac Vice*)
    tbayko@bpfalawfirm.com

    Christopher M. Faucett
    Texas Bar No. 00795198 (*Pro Hac Vice*)
    cfaucett@bpfalawfirm.com

    Matthew John Prebeg
    Texas Bar No. 00791465 (*Pro Hac Vice*)
    mprebeg@bpfalawfirm.com

    Stephen W. Abbott
    Texas Bar No. 00795933 (*Pro Hac Vice*)
    sabbott@bpfalawfirm.com

    Brent T. Caldwell
    Texas Bar No. 24056971 (*Pro Hac Vice*)
    bcaldwell@bpfalawfirm.com

    **BAYKO, PREBEG, FAUCETT & ABBOTT PLLC**
    8441 Gulf Freeway, Suite 307
    Houston, Texas 77002
    Tel: (832) 742-9263
    Fax: (832) 742-9261

    **COUNSEL FOR PLAINTIFFS**